**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO: 20-10925 |
| MOORE & MOORE TRUCKING, LLC, | § § | CHAPTER 13 |
| DEBTOR. | § § § | SECTION A |

---

## ORDER AND REASONS

On October 7, 2020, this Court held an evidentiary hearing to resolve the *Motion of Traylor Properties and Investments, LLC To Lift the Automatic Stay Pursuant to 11 U.S.C. § 362* (the "Lift-Stay Motion"), [ECF Doc. 30], filed by Traylor Properties and Investments, LLC ("Traylor Properties"); the opposition to the Lift-Stay Motion filed by Moore & Moore Trucking, LLC (the "Debtor"), [ECF Doc.42]; and Traylor Properties' Reply Brief filed in support of the Lift-Stay Motion, [ECF Doc. 62]. After considering the pleadings, the exhibits introduced into evidence, the testimony and demeanor of the witnesses, the record, applicable law, and the arguments of counsel, this Court DENIES the Lift-Stay Motion.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(A), (G) & (O). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT[1]

### A. The Debtor's Bankruptcy Filing and Post-Petition Activity

The Debtor, a Louisiana limited liability company, filed for bankruptcy relief on May 20, 2020, under subchapter V of chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. The Debtor continues to operate its business as a debtor-in-possession. Prior to filing for bankruptcy relief, the Debtor stated that it principally earned income pursuant to a contract to repair large-scale solar panel arrays in Texas; however, trade tensions between the United States and China, coupled with the COVID-19 pandemic, made obtaining replacement parts difficult and the counterparty to the contract terminated the agreement. [ECF Doc. 59]. According to the Debtor, it pivoted its business to home repair and home construction, but the pandemic interrupted operations to the point that the Debtor sought bankruptcy relief to avoid legal action by its creditors. [ECF Doc. 59].

In its Schedules, the Debtor listed its primary assets to include three tracts of immovable property: (a) a residential lot and home located at 14 Victorian Court in Violet, Louisiana, encumbered by a mortgage held by Regions Bank, which generates rental income in the amount of $1,000 per month (the "Rental Property"); (b) an unencumbered, unimproved tract of land located at 10405 Hwy. 70 in St. James, Louisiana (the "Unencumbered Lot"); and (c) an unimproved tract of land located at 5000 East St. Bernard Highway in Violet, Louisiana, encumbered by a mortgage held by Traylor Properties (the "Violet Lot"). [ECF Doc. 2]. The Debtor valued the Rental Property at $110,000, the Unencumbered Lot at $425,000, and the Violet Lot at $250,000. *See id.*

---

[1]     These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

Two proofs of claim have been filed in this case. The Internal Revenue Service asserts a claim of $9,483.40, listing $6,865.40 of that amount as an unsecured priority claim. Traylor Properties has asserted a secured claim in the amount of $221,901.92.[2] On August 17, 2020, Traylor Properties filed the Lift-Stay Motion pursuant to § 362(d)(1) and (2), seeking to modify the automatic stay imposed by § 362(a) of the Bankruptcy Code and foreclose upon the Violet Lot. The next day, on August 18, 2020, the Debtor timely filed a plan of reorganization. [ECF Doc. 34]. The Debtor amended its plan twice, first on September 30, 2020, and again October 6, 2020 (the "Amended Plan"). [ECF Doc. 59].

The Amended Plan proposes to pay all creditors 100% of their claims from the future income of the reorganized Debtor and from the planned sale of the Unencumbered Lot. [ECF Doc. 59]. The Amended Plan states:

> The Debtor shall market for sale the immovable property that it owns located at 10405 Hwy. 70, St. James, Louisiana [the Unencumbered Lot], as soon as is practicable following the Effective Date. The proceeds of the sale of that property [will be used] to pay, first, the remainder then due to the holders of all Allowed Priority Claims and of all Allowed General Unsecured Claims. Should the sale price of the property equal or exceed the sum of $350,000.00[,] Debtor shall have the option to retain $50,000.00 of the proceeds to meet its capital needs. The remainder of the proceeds shall be paid to the holder of the Class 1 Allowed Secured Claim [Traylor Properties] to reduce or fully pay the principal balance of and any accrued interest then due upon the claim depending on the remaining amount of sale proceeds available.
>
> The claimant shall retain its mortgage upon the collateral until it is paid in full pursuant to the terms of this Plan at which time is it [*sic*] shall request cancellation of its mortgage upon the public mortgage records of St. Bernard Parish, Louisiana.

[ECF Doc. 52, at 11–12]. The Amended Plan proposes to pay Traylor Properties over a term of ten years, with a balloon payment at the end of that term. [ECF Doc. 59, at 10–11]. In the

---

[2]   The bar date for filing general unsecured claims was July 29, 2020; the bar date for filing governmental proofs of claim is November 16, 2020. The Debtor's Schedules reflect debts owed to taxing authorities in the range of $7,200. [ECF Doc. 2].

Amended Plan, the Debtor disputes the amount of Traylor Properties' proof of claim and declares its intent to pay Traylor Properties "$173,720.39 or the amount allowed by the bankruptcy court or agreed to by the Debtor." [ECF Doc. 59, at 10].

### B.  The Evidentiary Hearing on the Lift-Stay Motion

To resolve the Lift-Stay Motion, this Court heard testimony from Daryl Traylor ("Traylor"), the principal of Traylor Properties, and Jerry L. Moore ("Moore"), managing member of the Debtor, and considered documentary evidence.  The Debtor does not dispute the validity of Traylor Properties' mortgage; rather, it argues that the amount it owes Traylor Properties has been overstated.  The parties also dispute the value of the Violet Property.

At the close of the evidence, the Court took the matter under submission.

### CONCLUSIONS OF LAW

"When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the Debtor."  *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 369 (1988).  But a creditor can request the automatic stay be terminated or modified "for cause" or, as to the stay applied to actions against property, if the debtor does not have equity in the property and if the property "is not necessary to an effective reorganization."  11 U.S.C. § 362(d). "Ultimately a decision granting or denying a motion to lift [the] automatic stay pursuant to 11 U.S.C. § 362(d) is left to the discretion of the Bankruptcy Judge and decided on a case-by-case basis, and the decision may be overturned only upon a showing that the bankruptcy court abused its discretion."  *HSH Nordbank AG v. Baytown Navigation, Inc. (In re Baytown Navigation, Inc.)*, No. H-12-36, 2012 WL 1123047, at *2 (S.D. Tex. Apr. 3, 2012) (citing *In re Fowler*, 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001)).

Traylor Properties moves this Court to grant it relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) and (2). This Court considers the arguments and evidence presented by the parties as applied to each of those sections of the Bankruptcy Code, starting with § 362(d)(2).

**A. Relief from Stay Pursuant to § 362(d)(2)**

"A secured creditor who seeks relief from the automatic stay under § 362(d) has the burden to demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property." *In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999) (citations omitted). "Once the movant establishes such a *prima facie* case, the burden shifts to the debtor-respondent to show that the property is necessary for an effective reorganization." *Id*. (citation omitted).

"Under § 362(d), 'equity' means the difference between the value of the property and the total amount of claims that it secures." *In re Elmira Litho, Inc*., 174 B.R. 892, 901 (Bankr. S.D.N.Y. 1994) (citations omitted); *see also Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 483, 524–26 (Bankr. E.D. Va. 2009) ("The [movants] have the burden of demonstrating lack of equity, which, for purposes of § 362(d)(2), requires a showing that the value of the collateral is less than the sum total of all of its liens."). The record indicates that Traylor Properties holds the only secured claim against the Violet Lot. To establish the amount of its claim and the validity and perfection of its security interest, Traylor Properties relied primarily on its timely filed proof of claim.[3]

---

[3]     The Debtor has not yet filed an objection to Traylor Properties' proof of claim, but disputed the amount of Traylor Properties' claim in the original plan and the amendments to that plan. [ECF Doc. 34, at 10 n.6; ECF Doc. 52, at 10 n.6; ECF Doc. 59, at 10 n.6]. Traylor Properties received notice of each plan and filed an objection to the first amended plan. [ECF Doc. 54]. The Debtor also objected to the Lift-Stay Motion and contested certain line items contained in Traylor Properties' proof of claim. [ECF Doc. 42]. Therefore, Traylor Properties has received sufficient notice that the amount of its claim is being challenged at least for the purposes of resolving the Lift-Stay Motion. *See United Student Aid Funds, Inc. v. Espinosa*,

"A proof of claim to be sufficient to establish *prima facie* validity of the debt must meet the requirements of Bankruptcy Rule 3001 and Official Form 10." *In re Armstrong*, 320 B.R. 97, 103 (Bankr. N.D. Tex. 2005). "When the claim is based on a writing, a copy of the writing shall be filed with the proof of claim, and if the documents are not available, the creditor must attach a statement that explains their unavailability." *Id*. (citing FED. R. BANKR. P. 3001(c)(1)). "Official Form 10 states that if the documents are voluminous, the creditor is to attach a summary of the documents, and if the claim includes prepetition interest or other charges such as attorney's fees, a statement giving a detailed breakdown of the elements of the claim is required." *Id*. at 104. "Although filing a proof of claim without any documents attached is not in and of itself cause to disallow a claim, it does result in the loss of *prima facia* validity." *In re Prevo*, 394 B.R. 847, 850 (Bankr. S.D. Tex. 2008).

### 1. *The amount and validity of Traylor Properties' secured claim*

Although the Debtor does not dispute the validity of Traylor Properties' mortgage, it argues that the amount listed as owed on the proof of claim is overstated. Traylor Properties filed a proof of claim asserting a secured claim of $221,901.92, inclusive of principal, interest, late charges, and various expenses. Traylor Properties attached to its proof of claim (i) the Act of Credit Sale evidencing the credit sale of the Violet Lot to the Debtor, the Mortgage Note, and proof of the

---

559 U.S. 260, 272 (2010); *United States v. Bros. Materials Ltd. (In re Bros. Materials Ltd.)*, 580 B.R. 475, 481–82 (S.D. Tex. 2017).

"Relief from stay proceedings . . . are primarily procedural; they determine whether there are sufficient countervailing equities to release an individual creditor from the collective stay." *In re Veal*, 450 B.R. 897, 914 (B.A.P. 9th Cir. 2011). "One consequence of this broad inquiry is that a creditor's claim or security is not finally determined in the relief from stay proceeding." *Id*. (citations omitted). Although this Court will determine the colorable amount of Traylor Properties' secured claim here for purposes of determining whether the Debtor has equity in the Violet Lot, this Court makes no final determinations regarding the allowed portion of any claim Traylor Properties may hold.

recording in parish records of a mortgage granted by the Debtor;[4] (ii) a payment history charting both the payments of principal and interest by the Debtor as well calculating unpaid principal and interest (the "Payment Summary"); and (iii) a one-page summary purporting to itemize other expenses included in its secured claim owed by the Debtor as of the Petition Date (the "Expense Summary"). *See* Debtor Ex. C. Traylor, who signed the proof of claim, testified as to each itemized category of charges.

a. Amounts owed by the Debtor for unpaid principal and interest

The testimony by both Traylor and Moore indicates that the Act of Credit Sale closed on September 22, 2015; after a payment of $40,000 that the Debtor paid at closing, the principal amount of the loan was $165,000. Hr'g at Min. 15:30:43–15:31:31; 15:54:21–15:55:03; Debtor Ex. C. The Act of Credit Sale required the Debtor to pay $1,744.94 per month, an amount which included principal and interest, for 120 months starting October 1, 2015. *See* Debtor Ex. C. Per the Act of Credit Sale, interest accrues at "the rate of FIVE (5.00%) percent per annum from date until paid." *See id.* At 5% interest per annum over 10 years, the interest owed on the Note should have totaled approximately $45,000.00. The evidence shows that the Debtor paid twelve payments of $1,744.94 and at least thirty-one payments of $1,000.00 toward repayment of the Note. *See id.* When presented with two copies of checks written by the Debtor and negotiated by Traylor, each in the amount of $1,000.00, dated July 17, 2019, and August 13, 2019, *see* Debtor Exs. F & G, Traylor admitted that credit for those payments could have been omitted from the payment history, Hr'g at Min. 16:04:05–16:07:10. Based on the evidence, the Court finds that the Debtor paid a total of $53,939.28 to Traylor Properties. The Payment Summary indicates that the Debtor paid

---

[4]     It appears that the pages of the Act of Credit Sale are reproduced out of order in both the proof of claim filed and the exhibit offered into evidence at the evidentiary hearing.

$26,165.08 in interest as of April 2019; when the uncredited $2,000 in payments for May and June 2019 are applied, the amount of interest paid totals approximately $27,339.08.[5] The Debtor's total payment toward principal, therefore, is approximately $26,600.20.

Traylor Properties claims as part of its secured claim the balance on the loan when the Debtor stopped making payments as well as unpaid interest through September 2025, the end of the term of the loan. Taking into account the two payments not recorded by Traylor Properties, the balance on the Act of Credit Sale as of July 2019 was $138,399.80, not $139,897.96 as listed in the Payment Summary.

Traylor was unable to testify as to the method of calculating unpaid interest through the end of the term of the loan as set forth on the Payment Summary. But the Payment Summary appears to indicate that Traylor Properties calculated 5% interest daily, not per annum, owed on $139,897.96, and, depending on the number of days in each month, added that amount each month to the principal balance for the remainder of the term. *See id.* It does not appear, however, that Traylor Properties compounded interest, also known as charging interest on interest.

Based on the foregoing, the Court finds that Traylor Properties' secured claim includes $138,399.80, the balance owed under the Act of Credit Sale as of July 2019, and, using Traylor Properties' method of calculating interest from July 2019 to the end of the contractual term, unpaid interest in the amount of $43,543.72.

---

[5] The Payment Summary indicates that each partial payment of $1,000 paid the full amount of interest owed for that month with the remainder being credited toward payment of principal. The Payment Summary shows that all payments on the Note stopped in April 2019; the two payments that Traylor Properties neglected to record should have been credited against the payments owed for May and June 2019. The Court estimates that accrued interest for those months would be $1,174.00.

b.   Late charges

Traylor Properties identified on the Expense Summary a line item for "Late Charges" in

the amount of $20,939.28.   *See* Debtor Ex. C.   The Debtor objects to the inclusion of those

expenses in the calculation of Traylor Properties' secured claim as unfounded.   Nothing in the

language of the Act of Credit Sale points to the right of Traylor Properties to charge late fees;

however, the Mortgage Note allows "a late charge of five (5%) percent of any monthly installment

not received by holder within fifteen (15) days after such installment is due."   Debtor Ex. C.   But

nothing on the Payment Summary reflects charges for late fees, and, although Traylor testified that

the Debtor made monthly payments on the Act of Credit Sale chronically late, he identified no

specific instances of late payments and did not support his assertion with documentary evidence

that Traylor Properties ever charged late fees to the Debtor.   *See* Hr'g at Min. 16:01:00–16:01:32;

16:19:28–16:19:32.   Therefore, this Court finds no basis to include the late fees of $20,939.28 in

Traylor Properties' secured claim for purposes of determining whether the Debtor holds equity in

the Violet Lot.

c.   Professional fees

The Act of Credit Sale provides:

> Attorney's Fees.   In case the Note should be placed in the hands of an
> attorney-at-law to institute legal proceedings to recover the amount thereof or any
> part thereof, in principal or interest, or to protect the interests of the holder or
> holders thereof, or in cause the same should be placed in the hands of an attorney
> for collection, compromise or other action, Mortgagor hereby agrees to pay the fee
> of the attorney who may be employed for that purpose, which fee is hereby fixed at
> twenty-five (25%) percent on the amount due or sued for or claimed or sought to
> be protected, preserved or enforced.

Debtor Ex. C. Traylor Properties included expenses in the amount of $2,050.00 for legal services

from the Potts & Potts law firm, as well as $3,500.00 for legal services provided by the law firm

9

of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard ("Lugenbuhl") and $700.00 for accounting

services provided by Charlie Dennis, CPA, in its claim against the Debtor, but attached no invoices

or other documents indicating the services provided, who provided them, and when. *See* Debtor

Ex. C. The Debtor objects to the inclusion of those expenses in the calculation of Traylor

Properties' secured claim, asserting that a determination of reasonableness cannot be made without

underlying documentation. *See* [ECF Doc. 42].

Traylor testified that the Potts & Potts law firm served as his personal attorneys and drafted

the Act of Credit Sale as well as proposed amendments after its execution. But Traylor could not

testify as to the hours spent on those services or the hourly rates of the attorneys who performed

the work. Even assuming that the services of Potts & Potts were provided "to protect the interests

of the holder or holders" of the mortgage on the Violet Lot pursuant to the Act of Credit Sale, this

Court does not have the evidence before it to be able to analyze the reasonableness of those fees.

*See In re Prevo*, 394 B.R. 847, 851 (Bankr. S.D. Tex. 2008) ("When a debtor objects to a secured

creditor's proof of claim for failing to provide any supporting documentation for its fees and costs,

and the creditor continues to fail and refuse to provide such documentation or adduce testimony,

the Court has no choice but to find that the fees and costs are unreasonable and unrecoverable.").

The same can be said for the Lugenbuhl fees. Traylor Properties did not attach any

documentation supporting its claim for the Lugenbuhl fees and Traylor could not testify as to what

services were provided, who provided them, and when. As to the fees requested for accounting

services performed by Charlie Dennis, CPA, this Court finds no basis in the Act of Credit Sale to

justify including those expenses in Traylor Properties' secured claim and, even if there were a

contractual basis for the fees, Traylor Properties presented no evidence that could be used by this

Court to determine the reasonableness of the fees. Therefore, this Court finds no basis to include

the requested professional fees identified in the Expense Summary in Traylor Properties' secured claim in this context.

d. Taxes, insurance, and property preservation

Traylor Properties claims on the Expense Summary certain costs it alleges to have spent to maintain its collateral, including payment of taxes, insurance, and maintenance work on the property such as repairing the gate and fences surrounding the property and re-anchoring a leaning power pole. Traylor Properties claims $3,069.53 for payment of "Taxes (redemption 2019)" and $7,600 for "Insurance, Property Preservation."

The Act of Credit Sale provides:

> In the event Mortgagor should, for any reason, fail to pay and discharge promptly any such taxes and charges when due, the Mortgagee shall be authorized to pay the same, with full subrogation to all rights of all authorities imposing such taxes and charges by reason of such payment, and the amounts so paid, together with interest thereon, as provided herein, shall be secured by this Mortgage . . . .

Debtor Ex. C. No documentary evidence was submitted proving payment of taxes by Traylor or Traylor Properties, nor did Traylor testify to making such payments.

Traylor also testified that he kept in place the insurance he placed on the Violet Lot prior to the sale to the Debtor, and maintained that insurance on the property "the whole time" thereafter, but he also testified that he only learned in the "last couple years" that the Debtor allegedly did not have adequate insurance. Hr'g at Min. 16:35:36–16:36:34. Although the Act of Credit Sale allows Traylor Properties to insure the Violet Lot in the event that the Debtor does not, and to require the Debtor to reimburse it for the costs of insurance with interest, *see* Debtor Ex. C, Traylor Properties presented no documents evidencing payments to provide insurance for the Violet Lot and did not demonstrate that insurance coverage was needed.

As to the alleged actions taken to maintain the property, Traylor testified that he paid to repair the fences and re-anchor a power pole on the Violet Lot. The Act of Credit Sale provides that "[u]pon any failure to maintain or keep the Property in repair, the Mortgagee, at its option, may cause reasonable repairs to be performed at the cost of Mortgagor." Debtor Ex. C. But again, presented no receipts or invoices evidencing payments of those expenses or a timeline of when that maintenance occurred. Further, the Court heard conflicting testimony regarding whether the repairs and maintenance were even necessary.[6] Therefore, the Court declines to include the amounts for taxes, insurance, and property preservation in the amount of Traylor Properties' secured claim at this time.

Based on the foregoing, the Court finds that Traylor Properties' total secured claim is valued at $181,943.52 for purposes of determining whether the Debtor has equity in the Violet Lot.

2. *Valuation of the Violet Lot*

"While the Bankruptcy Code does not establish a specific method of valuation under Section 362(d)(1) [&] (2), an analogous provision under Section 506(a) provides some guidance on valuation issues." *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, at *7 (Bankr. M.D.N.C. Mar. 14, 2005) (citing *United Sav., Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365, 371–72 (1988) (stating that statutory construction is a "holistic endeavor" and defining value of "entity's interest in property" entitled to adequate protection under §§ 361 and 362 in light of meaning of value of the

---

[6] The Court adds that the evidence revealed actions taken by Traylor against the Violet Lot that may indicate a self-help violation under Louisiana law or a violation of the automatic stay. *See* Hr'g at Min. 16:08:09–16:08:52 (Traylor's testimony that he had a chain and lock placed on the Violet Lot gate before his attorneys instructed him to remove it).

"creditor's interest" in property under § 506(a))).  Section 506 of the Bankruptcy Code states that the value of a creditor's interest "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conduction with any hearing on such disposition or use or on a plan affecting such creditor's interest."  11 U.S.C. § 506(a)(1).

Focusing on the phrase "proposed disposition or use" of a creditor's collateral in § 506(a)(1), the United States Supreme Court in *Associates Commercial Corp. v. Rash* held that the appropriate standard courts should use to value collateral is the "replacement-value standard." 520 U.S. 953, 962 (1997).  The Court defined "replacement value" as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id*. at 960.  The facts of *Rash* dealt with valuation determinations in the context of a chapter 13 plan confirmation; however, some bankruptcy courts have found the rationale in *Rash* to be helpful in valuing collateral for purposes of lift-stay motions in chapters 7 and 11.  *See, e.g.*, *In re Walck*, No. 11-37706, 2012 WL 2918492, at *2 (Bankr. D. Colo. July 17, 2012); *In re Pelham Enters., Inc.*, 376 B.R. 684, 691–92 (Bankr. N.D. Ill. 2007).  Indeed, "[p]ost-*Rash* case law suggests that *Rash* can be applied to the provisions of all three reorganization chapters—11, 12, and 13— because these chapters all treat secured claims similarly."  *In re Motors Liquidation Co.*, 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) (citing *In re Bell*, 304 B.R. 878, 880 n.1 (Bankr. N.D. Ind. 2003) and applying *Rash*'s "underlying thought process" to determine valuation method in the context of a § 363 sale); *see also In re Residential Capital, LLC*, 501 B.R. 549, 593–95 (Bankr. S.D.N.Y. 2013) (applying *Rash*'s ruling to adopt a going-concern valuation method to calculate an adequate protection claim based on diminution in value due to consensual use of collateral).

"Section 506(a) calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed."  *Rash*, 520

U.S. at 964.  Nothing in *Rash* or the text of § 506(a)(1) requires the "proposed disposition or use" of collateral to be viewed from a debtor's perspective; however, the record here is limited on the creditor's side.  Traylor Properties did not indicate in its papers or at the evidentiary hearing whether its intent is to liquidate the Violet Lot or keep the property and develop it itself if the automatic stay were lifted.  Moore testified that the Debtor currently uses the Violet Lot to store its trucks and equipment for use on the projects and contracts it has in the area, and proposes to continue to use the Violet Lot as storage for its trucks and equipment and also as the future location of its front office upon reorganization of the company.  *See* Hr'g at Min. 17:07:35–17:07:45; 17:09:15– 17:10:35; [ECF Doc. 42].

Traylor Properties urges this Court to apply an orderly liquidation method here to value the Violet Lot and has presented the 2020 Assessment Listing for the Violet Lot from the St. Bernard Parish Assessor, which values the Violet Lot for tax purposes at $177,240.  *See* Traylor Ex. 13. But the Court is not persuaded that § 506(a) allows this Court to apply that method here, as it does not consider the Violet Lot's "proposed disposition or use."  In applying a replacement-value standard, the *Rash* Court left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented."  520 U.S. at 965 n.6. "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property."  *Id*.

The Debtor purchased the Violet Lot in September 2015 for $205,000, *see* Debtor Ex. C, and valued the property at $250,000 in its Schedules, [ECF Doc. 2].  In his answers to discovery propounded by Traylor Properties, Moore stated that the valuation in the Debtor's Schedules is based on his own "knowledge and experience," as well as his familiarity "with the prices of other similar properties that have been offered for sale in the area during the last several years."  Traylor

Ex. 1. But the Debtor provided no details of those comparable sales to the Court. Moore also testified that he invested $35,000 to fill the property and add a gravel base to prevent the property from retaining water so that the Debtor could store its equipment there. *See* Hr'g at Min. 17:02:00–17:02:12; 17:05:40–17:05:55; 17:08:20–17:08:40.

The best indicator of value that the Court has before it is the actual sale price of the Violet Lot negotiated by these parties in 2015. The Court has seen no evidence to indicate that the Violet Lot—undeveloped land without buildings or structures—has depreciated in value since then. Accepting as true that the Debtor improved the Violet Lot to some degree by laying a gravel driveway, and considering the property's current and proposed use to be that of storing construction equipment and trucks, the Court finds the replacement value of the Violet Lot as of the date of the evidentiary hearing to be $210,000.[7]

### 3. *Necessary for effective reorganization*

Based on this Court's finding that the Violet Lot is valued at $210,000 and, for the purposes of resolving this Lift-Stay Motion, Traylor Properties' secured claim is valued at $181,943.52, the Court finds that the Debtor has equity in the Violet Lot. Because Traylor Properties has failed to meet its burden to show that there is no equity in the property, no need exists for the Debtor to prove that the Violet Lot is necessary for its effective reorganization. *See In re Kowalsky*, 235 B.R. 590, 594 (Bankr. E.D. Tex. 1999). Therefore, the Court denies the relief requested pursuant to § 362(d)(2). *Id.* (citing *In re Keene Corp.*, 171 B.R. 180, 182 (Bankr. S.D.N.Y. 1994)).

---

[7] Both Traylor and Moore opined on whether a proposed port expansion project in St. Bernard Parish would come to fruition and, if it did, whether it would have an effect on the value of the Violet Lot. The parties presented no credible evidence of the reality of the rumored port expansion project and, therefore, the Court did not consider that project in valuing the Violet Lot.

## B. Relief from Stay Pursuant to § 362(d)(1)

Traylor Properties also seeks to terminate the automatic stay under § 362(d)(1), which requires this Court to grant relief upon a finding of "cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). The burden of proof when resolving a motion to terminate the stay for cause rests with the Debtor. *See* 11 U.S.C. § 362(g). But § 362(d)(1) "requires an initial showing of cause by the movant" before the burden shifts to the Debtor. *In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) (citing *In re Syndicom Corp.*, 268 B.R. 26, 43 (Bankr. S.D.N.Y. 2001)); *see also In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994) ("[E]very party seeking relief from the automatic stay under § 362(d)(1) must carry the initial burden of showing that it is entitled to relief before the debtor is obligated to go forward with its proof." (citations omitted)).

"Cause" is not defined in the Bankruptcy Code; rather it is a fact-intensive inquiry that must be determined on a case-by-case basis. *See In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014). In its papers, Traylor Properties asserts that "cause" exists under § 362(d)(1) to lift the stay here because

>    (a)     the Debtor lacks equity in the Violet Property and any further diminution in its value will only further diminish Traylor's secured position and further increase the size of Traylor's unsecured deficiency claim to the detriment of the Debtor's other unsecured creditors; and
>
>    (b)     Traylor's interest in the Violet Property is not adequately protected due to . . . the fact that the Debtor has not demonstrated that is [*sic*] has adequate financial resources to maintain the Violet Property.

[ECF Doc. 30, ¶ 33]. "The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment's prohibition against taking private property without just compensation." *In re Young*, No. 7-11-12554, 2011 WL 3799245, at *7 (Bankr. D.N.M. Aug. 29, 2011) (citations omitted). "A secured creditor is entitled to adequate protection as [a] condition

16

to continuation of the automatic stay to compensate or protect the creditor from a decrease or threatened decrease in the value of the estate's interest in property that is the creditor's collateral as a result of the automatic stay." *Id*. The creditor "must, therefore, prove this decline in value—or the threat of a decline—in order to establish a *prima facie* case." *In re Elmira Litho, Inc*., 174 B.R. at 902 (citations omitted).

"The term 'adequate protection' is not defined in the Bankruptcy Code, but section 361 'gives examples of what might constitute adequate protection and, at least in one instance, of what will not constitute adequate protection.'" *In re Inwood Heights Hous. Dev. Fund Corp*., No. 11-13322, 2011 WL 3793324, at *8 (Bankr. S.D.N.Y. Aug. 25, 2011) (quoting 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][b]). Pursuant to § 361, adequate protection may be provided by

> (1)      requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2)      providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3)      granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. "It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection." *In re Elmira Litho, Inc*., 174 B.R. at 904. "It does not follow, however, that the existence or the absence of an equity cushion is material to the secured creditor's *prima facie* case." *Id*. "The only significance of the absence of an equity cushion is that is the collateral is *also* declining in value, it is more likely than not that the secured creditor is being injured by the continuation of the stay." *Id*. "The relevant inquiry remains, however, whether the

17

property is declining in value." *Id.*; *see also In re JCP Props., Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015).

The evidence before the Court shows that the Violet Lot is neither currently increasing or declining in value.  The evidence regarding the Debtor's non-payment of taxes and insurance was inconclusive.  In its Reply Brief, Traylor argued that the Violet Lot had been left by the Debtor "in a state of blight," and "may be overrun with vermin and/or snakes because of lack of maintenance and security."  [ECF Doc. 62, at 4, 6].  Traylor testified at the hearing regarding his concerns about the state of the Violet Lot and presented photos of the lot as evidence for his belief that the Violet Lot had not been maintained properly.  Hr'g at 15:32:10–15:33:21; 15:37:00–15:38:10; Traylor Exs. 10(a) & 10(c).  The Court is unpersuaded by this argument.  The Violet Lot is an undeveloped, grassy lot on the side of a highway.  It is not in a residential neighborhood, nor are there buildings on the lot that require maintenance.  No evidence of the presence of snakes or vermin on the Violet Lot was presented to the Court.  The fact that the Debtor may mow the lot irregularly is not enough to establish that the value of the Violet Lot is declining or is threatened to decline in value as a result of the automatic stay.  The Court finds that Traylor Properties has failed to establish a *prima facie* case for cause due to lack of adequate protection.  Therefore, the Court denies the relief requested pursuant to § 362(d)(1).[8]

---

[8]      The Court further observes that Traylor Properties has not requested provision of adequate protection from the Debtor.  "The Bankruptcy Code nowhere puts the responsibility on the debtor to initiate consideration of adequate protection of a creditor's noncash collateral."  *In re Sharon*, 234 B.R. 676, 684 (B.A.P. 6th Cir. 1999) (citations omitted).  "Entitlement to adequate protection in the first instance with respect to all property of the estate other than cash collateral is triggered by a creditor's request to the bankruptcy court and 'if you don't ask for it, you won't get it.'"  *Id.* (quoting *In re Robinson*, 225 B.R. 228, 233 (Bankr. N.D. Okla. 1998) (internal quotations and citation omitted)).

## CONCLUSION

For the foregoing reasons, this Court DENIES the *Motion of Traylor Properties and Investments, LLC To Lift the Automatic Stay Pursuant to 11 U.S.C. § 362*, [ECF Doc. 30].

New Orleans, Louisiana, October 14, 2020.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE