**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § § | CASE NO: 20-10925 |
| MOORE & MOORE TRUCKING, LLC, | § § | CHAPTER 13 |
| DEBTOR. | § § § | SECTION A |

---

### MEMORANDUM OPINION

Before the Court are

(1) the *Motion To Remove Debtor as Debtor in Possession Pursuant to 11 U.S.C. § 1185, or in the Alternative, To Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112* (the "DIP Removal Motion"), as supplemented, filed by creditor Traylor Properties & Investments LLC ("Traylor"), [ECF Docs. 115, 166 & 172]; and the opposition to that motion, as supplemented, filed by the Debtor, [ECF Docs. 136, 137 & 182];

(2) the *Fourth Modified Subchapter V Plan of Reorganization Dated February 1, 2021 Filed by Moore & Moore Trucking, LLC, d/b/a J.L. Solar Ops* (the "Plan"), [ECF Doc. 124], filed by the Debtor; the oppositions filed by Traylor, [ECF Docs. 135 & 173]; the response in support of the Plan filed by the Debtor, [ECF Doc. 142]; the limited objection to the Plan filed by the United States Trustee ("UST"), [ECF Doc. 175]; and the limited response to the Plan filed by the Subchapter V Trustee, [ECF Doc. 176]; and

(3) the *United States Trustee's Motion To Dismiss Case, or in the Alternative, To Convert Case to Chapter 7* (the "Motion To Dismiss"), as supplemented, [ECF Docs. 160 & 175]; and the Debtor's opposition to the Motion To Dismiss, [ECF Doc. 184].

On May 3 and 4, 2021, this Court held an evidentiary hearing to consider those matters (the "Hearing"), took the matters under submission, identifying the exhibits admitted into evidence and allowing the filing of post-trial briefs "on the legal issue of the Solvent Debtor Exception." [ECF Doc. 186].   Traylor and the Debtor each filed a post-trial brief.  [ECF Docs. 189 & 194].

After considering the pleadings, the exhibits introduced into evidence, the testimony and demeanor of the witnesses, the record in this case, applicable law, and the arguments of counsel,

this Court (i) CONFIRMS the Debtor's Plan, (ii) DENIES AS MOOT Traylor's DIP Removal Motion, and (iii) DENIES AS MOOT the UST's Motion To Dismiss.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(A), (B), (L) & (O). The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT[1]

### A.    The Debtor's Bankruptcy Filing and Post-Petition Activity

The Debtor, a Louisiana limited liability company, filed for bankruptcy relief on May 20, 2020, under subchapter V of chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. The Debtor is owned and operated by Jerry L. Moore ("Moore"). The Debtor continues to operate its business as a debtor-in-possession. Prior to filing for bankruptcy relief, the Debtor principally earned income pursuant to a contract to repair large-scale solar panel arrays in Texas; however, trade tensions between the United States and China, coupled with the COVID-19 public health emergency, made obtaining replacement parts difficult and the counterparty to the Debtor's contract terminated the agreement. *See* Plan, § 1.7 (admitted as Debtor Ex. A). According to the Debtor, it pivoted its business to home repair and home construction, but the pandemic interrupted

---

[1]    These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

operations to the point that the Debtor sought bankruptcy relief to avoid legal action by its creditors. *See id.*

In its Schedules, the Debtor listed its primary assets to include three tracts of immovable property: (a) a residential lot and home located at 14 Victorian Court in Violet, Louisiana, encumbered by mortgages held by Regions Bank ("Regions") and the U.S. Small Business Association ("SBA"), which generates rental income (the "Rental Property"); (b) an unencumbered, unimproved tract of land located at 10405 Hwy. 70 in St. James, Louisiana (the "Unencumbered Lot"); and (c) an unimproved tract of land located at 5000 East St. Bernard Highway in Violet, Louisiana, encumbered by a mortgage held by Traylor (the "Violet Lot"). [ECF Doc. 2]. The Debtor valued the Rental Property at $110,000, the Unencumbered Lot at $425,000, and the Violet Lot at $250,000. *See id.*

Five proofs of claim have been filed in this case. On July 17, 2020, the Internal Revenue Service asserted a claim of $9,483.40, listing $6,865.40 of that amount as an unsecured priority claim; it later amended its proof of claim on February 17, 2021, to assert only a general unsecured claim of $2,518. Traylor has asserted a claim in the amount of $221,901.92, secured by a mortgage on the Violet Lot. The SBA filed two proofs of claim: (i) a proof of claim asserting a claim in the amount of $119,752.36, secured by a multiple indebtedness mortgage on the Rental Property; and (ii) a proof of claim asserting a claim of $269,282.60, secured by the Debtor's machinery, equipment, and fixtures. On November 22, 2021, Regions filed a proof of claim for $40,959.69, secured by the Rental Property.[2]

---

[2] Regions filed its claim late, but the Debtor does not object to the late-filed claim and intends to pay the claim, even though the proof of claim filed is $10,959.69 more than the amount budgeted to be paid through the Plan. *See* Hr'g Tr. 13:14:58–:19:31 (Dec. 15, 2021).

3

The Debtor filed its first plan of reorganization on August 18, 2020, and amended that plan on September 30, October 6, and again on December 9, 2020.  [ECF Docs. 34, 52, 59 & 93].[3] After an evidentiary hearing on December 22, 2020, this Court denied the Debtor's third amended plan as unfeasible.  [ECF Doc. 107].  On January 20, 2021, Traylor filed the DIP Removal Motion. On February 1, 2021, the Debtor filed the new Plan.  Upon consent of the parties, the Court continued the confirmation hearing on the Plan to May 3, 2021.  [ECF Doc. 147].  On April 20, 2021, the UST filed its Motion To Dismiss, asking this Court to dismiss or convert the case "if the Debtor is unable to confirm its Fourth Plan after the evidentiary hearing on May 3, 2021."  [ECF Doc. 160, ¶ 12].  The Court set the Motion To Dismiss for consideration on May 3, 2021, with the Plan and Traylor's DIP Removal Motion.

### B.      The Debtor's Plan

The Debtor's Plan proposes to fund the Plan using its cash on hand, income generated by the Rental Property, income generated through the operations of the Debtor, and proceeds from the sale of the Unencumbered Lot.  *See* Plan, §§ 2.1 & 2.5.  As allowed under § 1191(e) of the Bankruptcy Code, the Plan proposes to pay 100% of administrative expenses through the Plan via monthly payments.  *See* Plan, § 1.2(A).  The Plan estimates taxing authorities to be owed $7,000 and proposes to pay 100% of those debts under § 1129(a)(9) in 48 regular installments, but adds that part of the proceeds from the sale of the Unencumbered Lot will be used to pay those debts. *See* Plan, § 2.1(B).

As to the Debtor's secured lenders, under the proposed Plan, Regions (Class 2) and the SBA (Class 3) will retain their security interests on the Rental Property and will receive 100% of

---

[3]      In the meantime, Traylor filed a motion to lift the stay on the Violet Lot.  [ECF Doc. 30].  After holding an evidentiary hearing, the Court denied that motion.  [ECF Doc. 68].

their allowed claims via monthly payments over 120 months at 5% interest, plus *pro rata* semiannual distributions of all of the Debtor's disposable income for three years after the Effective Date of the Plan, after holders of Allowed Priority Claims and Allowed General Unsecured Claims have been paid.  *See* Plan, § 2.2(A).[4]  As to Traylor's secured claim (Class 1), Traylor will retain its security interest on the Violet Lot, but the Plan proposes to limit Traylor's secured claim to $200,000, issue a new promissory note in that amount amortized over 240 months with 5% interest, and pay that claim through the Plan via 120 monthly payments of "no less than $1,500,"[5] with a balloon payment at Year 10 of approximately $48,000.  *See* Plan, § 2.2(A).[6]   The Plan further adds that the Debtor "shall employ best efforts to fully pay the debt prior to the end of the 120-month term," and will apply proceeds from the sale of the Unencumbered Lot first to unpaid Allowed Priority Claims and Allowed General Unsecured Claims and then to Traylor.  *Id.*  Further, Traylor will receive *pro rata* distributions of all of the Debtor's disposable income for three years after the Effective Date of the Plan with Classes 2 & 3, after holders of Allowed Priority Claims and Allowed General Unsecured Claims have been paid.  *Id.*  Under the Plan, Moore will retain his equity interests in the Debtor and will remain as the manager of the Debtor post-confirmation, but will not be paid a salary if the Debtor is not current on all payments required under the term of the Plan.  *See* Plan, § 2.7.

---

[4]     The Plan estimates that general unsecured claims (Class 4) total $4,000 and plans to pay 100% of those claims plus 5% interest.  *See* Plan, § 2.2(C).

[5]     The text of § 2.2(A) of the Plan states both that the Debtor will pay Traylor an amortized monthly payment of $1,391.91 per month and also "no less than $1,500" per month.

[6]     Although the Debtor has yet to file an objection to Traylor's proof of claim, it expressly "disputes that portion of the claim above the amount of $200,000.00."  Plan, § 2.2 n.5.  The Plan also allows the Debtor to object to any proof of claim within sixty days of the Confirmation Date.  *See* Plan, § 2.3.

In the event that the Debtor defaults on any of its obligations under the Plan and fails to cure such default within thirty days, a creditor may move the Court *ex parte* for an Order authorizing the Subchapter V Trustee to sell the Unencumbered Lot and any other of the Debtor's assets as needed to pay creditors holding allowed claims. *See* Plan, § 2.5. Similarly, if the Debtor defaults on its payments specifically to a creditor holding an allowed secured claim, that creditor may move the Court *ex parte* for an Order authorizing it to foreclose on its interests in the collateral that secures its claim. *See id*.

The Court finds that the Plan adequately provides the information required by § 1190(1) of the Bankruptcy Code, as it contains "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." The Plan further provides "for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1190(2).

### C.    The Confirmation Hearing

At the Hearing, the Court considered testimony and documentary evidence as listed in this Court's Order of May 7, 2021.  [ECF Doc. 186].  The Debtor elicited testimony from real estate broker Scott Guidry, who testified that, based on his fifteen years of experience and evaluation of the Unencumbered Property, the property could be listed at $374,616 and estimated that it would sell within six to twelve months. *See* Hr'g Tr. Min. 10:00:29–:11:20 (May 3, 2021).

John Williams, CPA, also testified on behalf of the Debtor.  Williams' experience as a CPA spans over twenty-five years; he has served as the Debtor's accountant since 2017. *See* Hr'g Tr. Min. 10:11:52–:13:13 (May 3, 2021).  The Court found Williams to be a credible witness and

afforded much weight to his testimony and work product.  Williams testified that he prepared the Monthly Operating Reports ("MORs") for the Debtor during the bankruptcy case, but had to amend those reports for November and December 2020, as well as January 2021, to account for certain of the Debtor's business expenses that had been transacted through Moore's personal account.  *See* Hr'g Tr. Min. 10:11:52:–15:38 (May 3, 2021) (referencing ECF Docs. 151–153). Moore testified that the bank maintaining the DIP account would hold deposited funds—even certified funds—for 14 days, making it difficult for the Debtor to transact business and pay suppliers and subcontractors timely; therefore, Moore resorted to using his personal bank account at a bank that placed only a 24-hour hold on deposits to be able to operate the Debtor's business. *See* Hr'g Tr. Min. 13:43:00–:49:20 (May 3, 2021).  Williams worked with Moore to reconcile the Debtor's DIP account and Moore's personal account and amend the MORs; in March 2021, Moore opened up a DIP account at another bank that would not impose any hold on deposited funds.  *See* Hr'g Tr. Min. 10:11:52–11:11:21; 13:43:00–:49:20 (May 3, 2021).  Based on the testimony given by Williams and Moore and a review of the Debtor's amended MORs, the Court finds that an accurate reconciliation of the Debtor's business transactions has been completed and the Court attributes no improper or deceptive motive to Moore in using his personal bank account to operate the Debtor for that period of time.  *See* Hr'g Tr. Min. 10:11:52–11:11:21; 13:43:00–:49:20 (May 3, 2021).

Moore, who the Court found to be an earnest witness, recounted the prepetition struggles of the Debtor, moving from solar-panel work to demolition/construction work, and explained that, post-petition, due to the ongoing effects of the COVID-19 public health emergency and the hurricanes that hit the Gulf Coast in Fall 2020, the Debtor has pivoted exclusively to residential roofing.  *See* Hr'g Tr. Min. 13:41:22–:42:50; 14:00:30–:22:00 (May 3, 2021).  Moore reviewed

7

the latest five-year net income projections for the Debtor's business, dated as of April 29, 2021, and prepared in consultation with Williams.  *See* Hr'g Tr. Min. 14:35:05–:35:30; 14:40:27–:38 (May 3, 2021); Debtor Ex. J.  Moore testified as to the volume of roofs the Debtor could install on a monthly basis, that the business was experiencing more demand than it could meet, and that he had no reason to believe that demand would decrease over the next few years.  *See* Hr'g Tr. Min. 14:04:33–:04:47; 14:43:15–:44:03 (May 3, 2021).  Williams and he based the Debtor's net income projections on the conservative estimate of the Debtor completing three average-sized roofs per week, even though in April 2021, for example, the company averaged five roofs per week.  *See* Hr'g Tr. Min. 11:24:20–:40:00; 14:40:27–:43:07 (May 3, 2021).

Moore also testified that the company has reached the equivalent of a "most favored customer" rating with its supplier such that it has secured a discounted rate for materials purchases going forward.  *See* Hr'g Tr. Min. 14:44:52–:45:30 (May 3, 2021).  Moore testified about his plans to increase advertising as finances allow, and to move the Debtor's office to the Violet Lot—where the equipment is stored—to achieve additional administrative efficiencies and cost-savings.  *See* Hr'g Tr. Min. 14:39:25–:40:21; 14:51:54–:52:40 (May 3, 2021).  On cross-examination, Moore admitted that the Debtor had no signed written contracts for future roofing work, but testified that it had roofing commitments for the next two weeks and it typically gets its business via phone calls which come in consistently.  *See* Hr'g Tr. Min. 10:19:43–:20:10 (May 4, 2020).  Moore further noted that, although the Debtor's profit-and-loss statements included in its recent March 2021 MOR indicated that the Debtor had not shown cash flow in January and February 2021, it had paid $25,000 in legal fees during those months, an expense that would be curbed significantly and eliminated altogether soon after the effective date if the Plan is confirmed.  *See* Hr'g Tr. Min. 09:26:46–:29:41 (May 4, 2021); *see also* Debtor Ex. I.  Moore pointed to the Debtor's ability to

8

cash flow in March 2021, in the absence of legal fee payments.  *See* Hr'g Tr. Min. 09:26:46–:29:41 (May 4, 2021); Debtor Ex. I (showing approximately $40,000 in net operating income in March 2021).

Moore testified that, although the Plan extended the maturity date of the debt owed to Traylor, the Debtor planned to pay Traylor $1500 per month, more than the amortized rate listed in the Plan.  *See* Hr'g Tr. Min. 15:00:00–:01:45 (May 3, 2020).  Moore confirmed that, since March 1, 2021, the Debtor had been paying Traylor $1500 per month adequate protection to protect against the diminution in value of its collateral.  *See* Hr'g Tr. Min. 14:53:12–15:00:07 (May 3, 2021); *see also* Debtor Exs. L & M; [ECF Doc. 133].

Traylor's principal, Darryl Traylor, also testified, recounting the Debtor's prepetition payment history of the debt owed to Traylor and expressing dissatisfaction regarding the Plan's intention to extend the term of the prepetition note.  *See* Hr'g. Tr. Min. 10:28:32–:41:33 (May 4, 2021).  Traylor testified that he believes that the 5% contractual rate of interest is no longer reasonable if the Debtor is allowed to extend the term of the debt.  *See* Hr'g. Tr. Min. 10:28:32–:30:57 (May 4, 2021).  A review of the prepetition note reveals that the parties elected not to include a provision imposing a default rate of interest in the event that the Debtor failed to fulfill its obligation under the Note.  *See* Traylor Ex. 4.

## CONCLUSIONS OF LAW

Effective February 19, 2020, the Small Business Reorganization Act added new subchapter V provisions codified at 11 U.S.C. §§ 1181–1195, designed to streamline the reorganization process for small business debtors.  Section 1191 of the Bankruptcy Code provides the rules for confirmation of a plan filed in a subchapter V case.  Section 1191(a) requires that all of the requirements of § 1129(a) (other than paragraphs (8), (10), and (15)) be met.

A. **The Debtor's Plan Satisfies All Applicable Provisions of § 1129(a).**

1. *Section 1129(a)(1)*

Section 1129(a)(1) incorporates the requirements of §§ 1122 and 1123, governing classification and contents of a plan. *See* H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977), S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978), U.S.C.C.A.N. 1978, pp. 5963, 5787, 5912, 6388. The Court observes that the Debtor's Plan properly classifies claims and interests in accordance with §§ 1122 and 1123, as well as provides for the same treatment by the Debtor of each claim or interest in each respective class, thereby satisfying § 1123(a)(4).

Further, the Court finds that the Debtor has provided adequate means for the plan's implementation, thus satisfying § 1123(a)(5), which allows in pertinent part, "retention by the debtor of all or any part of the property of the estate." 11 U.S.C. § 1123(a)(5)(A). Traylor objects to the Plan, stating that the Debtor has not demonstrated the business judgment to justify retaining the Violet Lot. [ECF Doc. 135, at 5–6; ECF Doc. 173, at 10–12]. The Court disagrees. As an initial matter, based on its position in the Bankruptcy Code following "who may file a plan" (§ 1121) and "classification of claims or interests" (§ 1122), the construction of the text of § 1123(a) itself, as well as its legislative history, § 1123 should simply be read as a roadmap that a plan proponent can use to find out what must go into a plan. *See generally In re Pac. Gas & Elec. Co.*, 273 B.R. 795, 807–08 (Bankr. N.D. Cal. 2002). Nevertheless, as discussed below, the testimony at the Hearing by Moore and his CPA suggests that the Debtor's Plan is feasible. Further, Moore also testified that the Debtor operates in the Violet community and uses the Violet Lot; it is where the Debtor stores its vehicles and heavy equipment and where Moore plans to relocate the main office of the business to streamline its operations. *See* Hr'g Tr. Min. 14:50:54–

10

:52:19 (May 3, 2021).  That evidence is sufficient for this Court to conclude that the Debtor has satisfied § 1123(a)(5)(A) and, therefore, the Court overrules Traylor's objection.

>2. *Section 1129(a)(2)*

Section 1129(a)(2) requires that the proponent of the plan comply with "applicable provisions" of the Bankruptcy Code, *i.e.*, disclosure and solicitation requirements, which are "the paradigmatic example[s] of what Congress had in mind within it enacted § 1129(a)(2)." *In re Pearl Res. LLC*, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020) (citing *In re Trans World Airlines, Inc.*, 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995); *In re Texaco, Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988)).  Section 1129(a)(2) is essentially inapplicable in a subchapter V case, as a separate disclosure statement is not required, unless the Court so orders. *See* 11 U.S.C. § 1187(c).

Traylor objects to the Debtor's Plan, asserting that it failed to comply with "applicable provisions" of the Bankruptcy Code when it commingled debtor-in-possession funds with those of the Debtor's principal.  [ECF Doc. 173, at 8].  As explained above, the Court finds that those violations were brought to the Court pre-confirmation and fully cured; thus, the Court overrules Traylor's objection and concludes that the Debtor has satisfied § 1129(a)(2). *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) ("Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code.  In fact, the legislative history mentions the provisions only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess., p. 412 (1977).  Certainly, if Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.").

11

3.      *Section 1129(a)(3)*

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." The Court concludes that the Debtor's Plan has not been proposed by any means forbidden by law. As to the requirement of good faith, "the Fifth Circuit has stated that the requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re Pearl Res. LLC*, 622 B.R. at 260 (citing *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)). Indeed, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d at 408. According to the Debtor, its business was first negatively affected by trade tensions between China and the United States, leading to the cancellation of its major contract for a failure to obtain parts needed to fulfill the contract, and soon after by the effects of the COVID-19 public health emergency, which brought operations to a standstill. *See* Hr'g Tr. Min. 13:41:22–:42:50; 14:00:30–:22 (May 3, 2021); Plan, § 1.7. It filed its case for bankruptcy relief to preserve its business as a going concern. *See* Plan, § 1.7. Based on the evidence before the Court and the provisions of the Plan, the Court concludes that the Debtor established by a preponderance of the evidence that it filed the Plan in good faith.

4.      *Section 1129(a)(4)*

Section 1129(a)(4) requires that any payment made by the Debtor for services "in or in connection with" the plan or the case be approved by the Court as "reasonable." To date, the Debtor has disclosed and the Court has reviewed and approved pre-confirmation payments of fees

and expenses.  No party in interest has objected to the Plan based on § 1129(a)(4).  The Court has reviewed the Plan and concludes that it complies with § 1129(a)(4)'s requirements.

### 5.    *Section 1129(a)(5)*

Section 1129(a)(5) requires that the Debtor's Plan disclose any individual proposed to serve "as a director, officer, or voting trustee of the debtor" and that the appointment is "consistent with the interests of creditors and equity security holders and with public policy."  No party in interest objected to the Plan regarding this provision.  Here, the Plan proposes to reinstate Moore as manager of the reorganized Debtor.  *See* Plan, § 2.7.  The Court concludes that result to be acceptable and in compliance with § 1129(a)(5).

### 6.    *Section 1129(a)(6)*

Section 1129(a)(6) requires that "any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." That provision is not applicable here.

### 7.    *Section 1129(a)(7)*

The text of § 1129(a)(7), known as the "best interests" test, requires that each objecting creditor receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation of the debtor.  Here, no party in interest has objected to the Plan under this provision. Nevertheless, based on a review of the Debtor's Plan and liquidation analysis attached as Exhibit D to the Plan, which the Court finds to be credible, the Court finds that creditors will receive 100% of their allowed claims under Plan with interest.  If the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code, the risk exists that a forced sale of assets would render reduced

proceeds, leaving creditors with less than their allowed claim amounts. *See* Plan, Art. 4. Therefore, the Debtor has satisfied § 1129(a)(7).

        *8.     Section 1129(a)(8)*

Section 1129(a)(8) requires that each class of claims or interests accept the Plan or not be impaired under the Plan; that section, however, is one of three subsections of § 1129(a) that does not have to be satisfied for a subchapter V plan to be confirmed. *See* 11 U.S.C. § 1191(b).

        *9.     Section 1129(a)(9)*

Section 1129(a)(9) governs the manner in which unsecured priority tax claims must be paid unless the holder of a particular claim has agreed to a different treatment. The Debtor asserts that it owes only unsecured priority tax claims under § 507(a)(8). *See* Plan, §§ 2.1(B) & 2.2(B). No party in interest has objected to the Plan's treatment of § 507(a)(8) unsecured priority tax claims. The Plan proposes to pay those claims in full in regular installments over a period of 48 months, as required by § 1129(a)(9)(C). *See* Plan, § 2.1(B). Therefore, the Court concludes that the Debtor has carried its burden under § 1129(a)(9).

        *10.     Section 1129(a)(10)*

Section 1129(a)(10) requires that at least one non-insider, impaired class of creditors has accepted the plan. As stated above, however, § 1129(a)(10) does not have to be satisfied to confirm a plan in subchapter V. *See* 11 U.S.C. § 1191(b). Nevertheless, Class 3 (Small Business Administration) and Class 4 (General Unsecured Creditors) are impaired and voted to accept the Plan. *See* Plan, § 2.2; [ECF Doc. 181 (Tabulation of Ballots)].

        *11.     Section 1129(a)(11)*

The text of § 1129(a)(11), known as the "feasibility test," requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial

14

reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  Traylor objects to the Plan, asserting the Plan is not feasible because the Debtor's income is "based on vague and unsubstantiated sources." [ECF Doc. 135, at 6–7; ECF Doc. 173, at 6–7].

For a plan to be considered feasible, "a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence." *In re Pearl Res., LLC*, 622 B.R. 236, 263 (Bankr. S.D. Tex. 2020) (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P-Ship (In re T-H New Orleans Ltd. P-Ship)*, 116 F.33d 790, 801 (5th Cir. 1997)).  "The bankruptcy court must make a specific finding as to feasibility after engaging in a peculiarly fact intensive inquiry that involves a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute." *Id.* (citing *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015)).

It is true that the Debtor has been required to pivot the focus of its business to adjust to market availabilities and has now settled exclusively on residential roofing. *See* Hr'g Tr. Min. 13:14:22–:42:50; 14:00:30–:22 (May 3, 2021).  It is no surprise that the lingering effects of the COVID-19 public health emergency have negatively affected the operations of this Debtor, particularly as it relates to the income generated by the Rental Property. *See* Hr'g Tr. Min. 09:29:55–:35:11 (May 4, 2021).  The pandemic has also made financial and operational planning difficult for debtors and has significantly impaired the usefulness of a debtor's past financial performance in considering issues such as feasibility in this context.  Nevertheless, although January and February 2021 MORs indicate weak or negative net cash flow, those dips were explained by the Debtor's payment of legal bills during those months, an expense which will

15

decrease and be eliminated altogether soon after the effective date of a confirmed plan.  *See* Hr'g Tr. Min. 09:26:46–:26:41 (May 4, 2021); Debtor Ex. I.  Beginning in March 2021, however, the Debtor's monthly operating reports filed into the record demonstrate that it can cash flow, even while paying Traylor $1500 per month.  *See* Debtor Ex. I; [ECF Docs. 191 & 227]; Hr'g Tr. Min. 14:53:12–15:00:07 (May 3, 2021).

The Court finds that the Debtor has established a viable business model in residential roofing and has worked to achieve cost-savings where it can by, as an example, earning discounts from its materials supplier going forward.  *See* Hr'g Tr. Min. 14:44:52–:45:30 (May 3, 2021). Further, the Plan states, and Moore acknowledges, that he cannot take a salary unless the Debtor is current with Plan payments.  *See* Plan, § 2.7; Hr'g Tr. Min. 14:37:01–:38:54 (May 3, 2021). And this Debtor has something that many debtors do not:  unencumbered property.  The Plan provides that the Plan will be funded by the operations of the Debtor, but also through the sale of the Unencumbered Lot.  *See* Plan, § 2.5.  Given the relatively low sums due to priority and general unsecured creditor classes, the proceeds from the sale of the Unencumbered Lot could well cover the amount of the balloon payment owed to Traylor.  Thus, based on the record in this case and the evidence provided at the Confirmation Hearing, the Court finds that the Debtor has satisfied its burden to show not only that the Plan is feasible under § 1129(a)(11), but also that a reasonable likelihood exists that the Debtor will be able to make all plan payments, *see* 11 U.S.C. § 1191(c)(3)(A).

12.     *Section 1129(a)(12)*

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan."  No party in interest has objected to the Plan regarding this section.  The Debtor paid filing fees owed pursuant to 28 U.S.C.

16

§ 1930(a).  [ECF Doc. 13].  Payment of quarterly fees to the United States Trustee are not required

under subchapter V.  *See* 28 U.S.C. § 1930(a)(6).  Thus, the Court finds that the Debtor has satisfied

§ 1129(a)(12).

13.      *Section 1129(a)(13)*

Section 1129(a)(13) requires that a plan provide for "the continuation after its effective

date of payment of all retiree benefits," as defined and required in § 1114 of the Bankruptcy Code,

"at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated

itself to provide such benefits."  That provision is not applicable in this case.

14.      *Section 1129(a)(14)*

Section 1129(a)(14) requires a debtor to keep current on any domestic support obligations

"required by a judicial or administrative order, or by statute" that becomes payable after the

Petition Date.  That provision is not applicable in this case.

15.      *Section 1129(a)(15)*

Section 1129(a)(15) requires that if the debtor is an individual and an unsecured creditor

has objected to confirmation of the plan, the property to be distributed to that unsecured creditor

must not be less than the value required by § 1129(a)(15).  Aside from the fact that satisfaction of

§ 1129(a)(15) is not required to confirm a plan in subchapter V, *see* 11 U.S.C. § 1191(b), the

provision does not apply because the Debtor here is not an individual.

16.      *Section 1129(a)(16)*

Section 1129(a)(16) is likewise inapplicable here.  That provision requires that all transfers

of property under the plan shall be made in accordance with any applicable provisions of non-

bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed,

business, or commercial corporation of trust.  *See* 11 U.S.C. § 1129(a)(16).

17

Based on the foregoing, the Court finds that the Debtor has satisfied all applicable provisions of § 1129(a).

### B.      The Debtor's Plan Treats Traylor's Secured Claim (Class 1) Fairly and Equitably.

"*Cram down* is a colloquial expression used in bankruptcy practice to signify confirmation of a reorganization plan notwithstanding the negative vote of a secured creditor class—the court figuratively crams the plan down the throat of the dissenting class." *In re Sunflower Racing, Inc.*, 219 B.R. 587, 590 (Bankr. D. Kan. 1998). Subchapter V does not change existing law regarding permissible cram down treatment of secured claims. If all applicable § 1129(a) subsections are satisfied, § 1191(b) requires that "the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1191(c)(1) simply adopts the existing rules found in § 1129(b)(2)(A) for permissible cramdown on secured creditors, which defines fair-and-equitable treatment as follows:

(A) With respect to a class of secured claims, the plan provides—

    (i)      (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

            (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

    (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).[7]

The Plan here provides that Traylor will retain its mortgage on the Violet Property while it receives monthly payments of $1500 in principal and interest for 120 months, with a balloon payment of approximately $48,000 at the end of the term, plus *pro rata* distributions of all of the Debtor's disposable income for three years, and receipt of certain proceeds from the sale of the Unencumbered Lot.  *See* Plan, § 2.2.  Traylor objects to the Plan, asserting that the Plan fails to treat its secured claim fairly and equitably.

> 1.    *The application of the solvent-debtor exception here is improper and unwarranted*

Traylor's primary argument asserted in its written objections to the Plan and in the testimony of Traylor's principal is that the Debtor is "solvent" and, therefore, should not be allowed to alter any of the terms of its prepetition promissory note—specifically, the maturity date—to prevent Moore from receiving a windfall.  [ECF Doc. 135, at 4–5; ECF Doc. 173, at 5–

---

[7]    Judge Learned Hand introduced the "indubitable equivalence" concept in discussing acceptable cramdown methods when he observed:

> The last [method of providing a dissenting class adequate protection of the full value of its claim] is not, properly speaking, a 'method' at all; it merely gives power generally to the judge 'equitably and fairly' to 'provide such protection,' that is, 'adequate protection,' when the other methods are not chosen.  It is this alone which the debtors here invoke.  In construing so vague a grant, we are to remember not only the underlying purpose of the section, but the constitutional limitations to which it must conform.  It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now.  Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property.  We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Metro. Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, 75 F.2d 941, 942 (2d Cir. 1935).

6]; Hr'g. Tr. Min. 10:28:32–:30:57.[8]   Assuming without deciding that the Debtor is solvent, this
Court is not persuaded that Traylor's proposed application of the solvent-debtor doctrine is one
supported by the case law applying the doctrine or allowed under the Bankruptcy Code.

Under § 502(b) of the Bankruptcy Code, interest as part of a claim ceases to accrue upon
the filing of a bankruptcy petition.[9]   The "solvent-debtor exception" to that general rule prohibiting
post-petition interest is a judicial doctrine pre-dating the Bankruptcy Code that allowed creditors
of a solvent debtor to recover post-petition interest from any surplus funds before those funds could
be distributed to the debtor or the debtor's heirs.   *See In re Ultra Petroleum Corp*., 624 B.R. 178,
196 (Bankr. S.D. Tex. 2020).   Traylor seeks to broaden the solvent-debtor exception to prevent a
solvent debtor from extending the maturity date of a prepetition promissory note, lifting (somewhat
out of context) the observation from the Fifth Circuit that "absent compelling equitable
considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the
creditors' contractual rights." [ECF Doc. 135, at 5 (quoting *Ultra Petroleum Corp. v. Ad Hoc
Comm. of Unsecured Creditors of Ultra Res., Inc. (In re Ultra Petroleum Corp.)*, 943 F.3d 758,
765 (5th Cir. 2019))].

Drawing an important distinction between whether the Bankruptcy Code or the plan of
reorganization is the vehicle that impairs a class of creditors, the Fifth Circuit's *Ultra Petroleum
Corp.* opinion reversed a bankruptcy court's ruling that a debtor's plan impairs a creditor if it
refuses to pay an amount independently disallowed by the Bankruptcy Code.   *See In re Ultra
Petroleum Corp.*, 943 F.3d at 762–65.   But the Fifth Circuit remanded the case to allow the

---

[8]   Traylor asserts this Debtor is "solvent" because the Debtor's schedules reflect that the value of its
assets exceed that of its liabilities as of the Petition Date.   [ECF Doc. 135, at 2].

[9]   One statutory exception to this rule is found in § 506(b), which allows oversecured creditors to
recover post-petition interest up to the value of the collateral—whether a debtor is solvent or not.

bankruptcy court to address whether the Code disallowed unsecured creditors' post-petition claims under contractual "make-whole" or default interest provisions—or whether application of the solvent-debtor exception entitled them to both awards. *See id.* at 765. In so doing, the Fifth Circuit hypothesized that the solvent-debtor exception could apply to the unusual facts presented in *Ultra Petroleum*, but left the "first view" of that issue to the bankruptcy court. *Id.* at 766.

On remand, the bankruptcy court found that the solvent-debtor exception indeed "survived" the enactment of the Bankruptcy Code, observing that the doctrine is an equitable remedy designed to protect unsecured creditors. *See In re Ultra Petroleum Corp.*, 624 B.R. at 198. As explained by the bankruptcy court:

> Limiting claims to prepetition interest is of overwhelming consequence when creditors must share a limited pool of assets, but that limitation is without cause when the debtor can afford to pay all of its debts. **Instead, when the debtor is solvent, the equitable tug exists between unsecured creditors and the debtor's equity holders.** The solvent-debtor exception ensures that the debtor does not receive a windfall at the expense of its creditors.

*Id.* (emphasis added). The *Ultra Petroleum* case addressed whether a solvent debtor may be required to pay "make whole" amounts or post-petition default interest to unimpaired, unsecured creditors. But it does not speak to whether a solvent debtor is prohibited from proposing a plan that impairs a secured creditor class by extending the maturity date of the prepetition note.

The court in *In re Good*, on the other hand, dealt with whether a solvent debtor's plan treatment of a secured creditor was fair and equitable under § 1129(b)(2)(A). *See* 413 B.R. 552, 557–61 (Bankr. E.D. Tex. 2009). The *Good* court acknowledged that "[t]he Fifth Circuit has not addressed the enforcement of the contractual rights of an oversecured creditor in a bankruptcy case involving a solvent debtor," but observed that the Fifth Circuit and other Circuits have allowed awards of post-petition default interest to unsecured creditors using the solvent-debtor exception.

21

*Id*. at 558–59 (citing *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668 (6th Cir. 2006); *Johnson v. Norris*, 190 F. 459 (5th Cir. 1911)). Given the rare set of facts before it—a solvent debtor, an oversecured creditor, the fact that payment of over $1 million in default interest would not reduce any other creditors' payments under the plan, and that "such payment would simply reduce the $85,000,000 in equity that may be available to [the equity holder] at the conclusion of the plan in four years"—the *Good* court applied the solvent-debtor doctrine and concluded that the secured creditor was entitled to a cramdown interest rate equal to the contractual default interest rate.  *Id*. at 558–61.

"While the solvent-debtor exception survives, it must be applied within the parameters of the Bankruptcy Code."  *In re Ultra Petroleum Corp*., 624 B.R. at 200.  Indeed, "the plain terms of the Bankruptcy Code provide that a plan may extend the maturity date of a loan."  *In re Good*, 413 B.R. at 560 (citing 11 U.S.C. § 1123(a)(5)).  It is true that the *Good* court limited—but did not prohibit—the extension of the maturity date of the secured creditor's note.  *Id.* at 560–61.  But the equities that the court weighed in making its decision are not present here.  The secured creditor's recovery under the *Good* plan was limited until the debtor developed and sold its various assets: quarterly interest-only payments and "minimum principal payments of 5% at the end of each calendar year until the promissory note matures under the plan."  *Id*. at 555.  The *Good* court found that

> [the debtor] is solvent, and [the equity holder] anticipates that his continued operation of the Debtors . . . will generate approximately $85,000,000 in equity over the next four years.  It would offend the priorities of the Bankruptcy Code to allow [the equity holder] to accumulate or reinvest this equity over the next four years, without fully satisfying [the secured creditor's] claim, when the undisputed evidence shows that [the secured creditor's] allowed secured claim could be satisfied in less than four years.

22

*Id*. at 561.  In balancing those equities, the *Good* court allowed the debtor to extend the maturity date of the loan for three years, instead of four.  *Id*.  Under the Debtor's Plan here, however, Traylor will receive payment of its claim in full via monthly principal and contractual interest payments beginning on the effective date of the Plan—plus *pro rata* distributions of all the Debtor's disposable income for three years and proceeds from sale of the Unencumbered Lot.  Thus, the Debtor's equity holder will not continue to accumulate equity while Traylor receives neither money nor its collateral.  The Court, therefore, finds no need in equity to limit the Debtor's proposed treatment of Traylor's secured claim under the Plan.

> 2.    *Traylor's secured claim is treated fairly and equitably under § 1129(b)(2)(A)(i) and (iii)*

Although Traylor's counsel asserted after the close of evidence at the Hearing and in post-trial briefing that the Debtor failed to satisfy its burden to show that 5% contractual interest is an appropriate cramdown rate, the Court disagrees.  The prepetition contract calls for 5% interest and the parties declined to include a default interest provision.  *See* Traylor Ex. 4; Hr'g Tr. 11:05:15–:05:20 (May 4, 2021).  The Court takes judicial notice that the "Bank prime loan" rate as published by the Federal Reserve for January 10, 2022, was 3.25%, https://www.federalreserve.gov/releases/h15/.  *See In re Cachu*, 321 B.R. 716, 720 & n.4 (Bankr. E.D. Cal. 2005).  The Court finds that the contract rate of 5% chosen by the parties is an appropriate rate of cramdown interest and adequately compensates for the risk that Traylor bears for not receiving its money today.  *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 801 (5th Cir. 1997); *see also Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters. Ltd., II),* 994 F.2d 1160, 1169 (5th Cir. 1993).  Given the circumstances in this case, the Court concludes that the Plan's proposal of

a 5% contractual interest rate, together with monthly principal payments under the new note, *pro rata* distributions of all of the Debtor's disposable income for three years, and receipt of certain proceeds from the sale of the Unencumbered Lot, provides Traylor with the present value of its allowed secured claim.

Because the Debtor's Plan provides that Traylor will retain its lien on the Violet Property and receive a stream of payments having a present value equal to the secured claim (including an appropriate cramdown rate of interest), the Court finds that the Debtor's Plan meets the requirements of § 1129(b)(2)(A)(i) (incorporated by § 1191(c)(1)), and thus, treats Traylor's secured claim in Class 1 fairly and equitably. The Court further finds that the Debtor's Plan treats Traylor's claim fairly and equitably under § 1129(b)(2)(A)(iii). "Where a secured creditor will receive payment in full on its allowed secured claim over a reasonable period of time with an appropriate interest rate, the indubitable equivalent standard [of § 1129(b)(2)(A)(iii)] is satisfied." *In re Good*, 413 B.R. at 560 (citing *Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1350 (5th Cir. 1989)).

> 3.    *Traylor's secured claim is treated fairly and equitably under § 1191(c)(3)*

Lastly, § 1191(c)(3) adds two additional factors to the "fair and equitable" analysis. First, the debtor must show (i) that it will be able to make all plan payments or (ii) a reasonable likelihood exists that it will be able to make all plan payments. *See* 11 U.S.C. § 1191(c)(3)(A). Although that requirement "fortifies the more relaxed feasibility test that § 1129(a)(11) contains," *In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020), this Court has already found in its discussion of § 1129(a)(11) above that the Debtor satisfies that heightened requirement. The second factor added by § 1191(c)(3) requires that the Plan provide appropriate remedies to protect holders of

claims or interests if the debtor does not make the required plan payments.  *See* 11 U.S.C. § 1191(c)(3)(B).  As to Traylor, the Debtor's Plan provides the following remedy:

> Should the Debtor default on its payment obligation to any creditor holding an Allowed Secured claim and, thereafter, fail to cure such payment default within thirty (30) days after being provided written notice of said default the creditor affected by the default may move the Court on an *ex parte* basis, for an order authorizing the creditor to foreclose its interests in the collateral that secures its claim or such other relief relating to its collateral as it may deem appropriate and necessary.  The *ex parte* motion shall be supported by an affidavit identifying the default, attesting that the written notice of the default was provided to the Debtor, and further attesting to the Debtor's failure to cure the default within thirty (30) days of said notice of default.

Plan, § 2.5.  Because Traylor has an avenue to foreclose on the Violet Property in the event of the Debtor's default in Plan payments, the Court finds that the Debtor's Plan provides appropriate remedies to Traylor as required by § 1191(c)(3)(B).[10]

For the reasons above, the Court finds that the Plan fairly and equitably treats Traylor's Class 1 secured claim.

## CONCLUSION

For the foregoing reasons, this Court confirms the *Fourth Modified Subchapter V Plan of Reorganization Dated February 1, 2021 Filed by Moore & Moore Trucking, LLC, d/b/a J.L. Solar Ops*, [ECF Doc. 124], and overrules all objections.

An Order consistent with this Memorandum Opinion will be entered on the docket contemporaneously herewith, confirming the Debtor's Plan and denying as moot Traylor's *Motion To Remove Debtor as Debtor in Possession Pursuant to 11 U.S.C. § 1185, or in the Alternative,*

---

[10]   No unsecured creditors objected to the Plan.  The Plan provides that, in the event that the Debtor defaults on Plan payments to any unsecured creditor and does not timely cure the default, that creditor may move the Court for an Order allowing the Subchapter V Trustee to market and sell the Unencumbered Lot (if not already sold as provided for in the Plan) and distribute the proceeds, as well as any other property of the Debtor that the Subchapter V Trustee determines is necessary.  *See* Plan, § 2.5.  The Court finds the Plan proposes appropriate remedies to unsecured creditors as required by § 1191(c)(3)(B).

*To Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112*, as supplemented, [ECF Docs. 115, 166 & 172], and the *United States Trustee's Motion To Dismiss Case, or in the Alternative, To Convert Case to Chapter 7*, as supplemented, [ECF Docs. 160 & 175].

New Orleans, Louisiana, January 12, 2022.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE